IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                 No. CR 10-2453 MV

ALFREDO ARAGONES,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Alfredo Aragones's Motion to Suppress Evidence Obtained as a Result of Violations of Amendment IV to the United States Constitution [Doc. 18], filed December 9, 2010.  The Court has considered the Motion, the Government's Response [Doc. 21], the evidence and arguments presented at the March 18, 2011 hearing, the relevant law, and being otherwise fully informed, **FINDS** that the Motion should be **GRANTED** for the reasons stated herein.

## FACTUAL BACKGROUND

In their briefing, the parties recounted substantially different versions of the facts that led up to the challenged search.  The facts as established at the evidentiary hearing on March 18, 2011 are as follows.  In the section titled "Discussion," *infra*, the Court will resolve the facts that remained in dispute at the hearing.

On April 8, 2010 at approximately 7:23 p.m., Defendant was walking westbound on Dan Street in southeast Albuquerque, in a high-crime area known as "the sticks."  Officer Keith Sandy of the Albuquerque Police Department pulled up alongside Defendant in his patrol vehicle, and slowed his speed to Defendant's pace.  Officer Sandy observed that Defendant had a

large tattoo on the back of his head, which the officer described as "consistent with gang affiliation." 3/18/11 Evid. Hr'g Tr. at 11.[1]  Defendant did not look at Officer Sandy, but abruptly changed direction and turned into a yard near the intersection of Dan and Edith streets, and proceeded to walk up to the back door of a house.  The residents of the home were Prospero and Luella Benavidez, and Defendant knocked on their door.  The residence had a wrought iron door, which was closed, as well as an interior door, which was open.  The details surrounding Defendant's contact with the Benavidezes remained in dispute during the hearing, and this contact will be described in detail below.

After observing Defendant on the Benavidezes' porch, Officer Sandy exited his vehicle. He called out to Defendant and asked him to approach the officer.  Defendant ignored this request.  The officer proceeded to walk toward the Benavidez residence and approach Defendant, and observed Defendant look left and right, in a manner the officer experienced as "consistent with . . . an individual that's looking for an exit . . . his best exit route to run." *Id*. at 15.  Officer Sandy saw that Defendant's hand was in his pocket, which made the officer feel threatened.  He requested that he remove his hand from his pocket, and Defendant did not comply.  In Officer Sandy's experience, Defendant's refusal to remove his hand from his pocket indicated that he was holding something that might harm the officer.  He then continued to approach Defendant and ordered him to remove his hand from his pocket; Defendant again refused.  Accordingly, the officer grabbed Defendant's wrist to take control of his hand.  Officer Sandy handcuffed Defendant and patted him down, discovering a sawed-off rifle in Defendant's pocket.

---

[1]  This Memorandum Opinion and Order cites to the court reporter's unofficial transcript. All page citations are subject to change on the official, edited version.

Upon detaining Defendant, Officer Sandy spoke to the Benavidezes and they agreed to prepare a statement describing the incident.  This statement, which Mr. Benavidez dictated to Mrs. Benavidez because he is unable to write well, reads as follows: "A man came to my door which we don't know, he was looking inside through the screen door + I refused to open the door."  Gov't Ex. 4.  Officer Sandy cited Defendant for violation of Albuquerque City Ordinance Section 12-2-21(B) (Public Nuisance)[2] as well as Section 30-7-16 of the New Mexico Statutes (Felon in Possession of a Firearm).  On August 25, 2010, a federal grand jury indicted Defendant for Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g).  He moves to suppress the firearm in question, arguing that Officer Sandy's search violated the Fourth Amendment.

## APPLICABLE LAW

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. CONST. AMEND. IV.  An investigatory stop is a "seizure" within the meaning of the Fourth Amendment.  *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010).  Such a stop is "reasonable only if 'justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.'" *Id*. (quoting  *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

Whereas an arrest requires probable cause of criminal activity, an investigatory stop need only be based on the lesser standard of reasonable suspicion.  *Id*.  This requires an officer to articulate "a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  The officer must point to specific, articulable facts to

---

[2] The public nuisance ordinance proscribes, among other conduct, "[e]ntering upon any private property and looking into any occupied dwelling without the consent of the occupant or owner of the dwelling."  Albuquerque Ord. § 12-2-21(B).

support his conclusion that he had reasonable suspicion to conduct the stop, and the Government may further point to "rational inferences drawn from those facts [that] give rise to a reasonable suspicion a person has or is committing a crime." *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009) (quotation omitted).  In conducting the reasonable suspicion calculus, an officer must look to the totality of the circumstances, and he may "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (quotation omitted).  The Government bears the burden of proving that Officer Sandy possessed the requisite reasonable suspicion to support the investigatory stop. *Simpson*, 609 F.3d at 1146 (citing *United States v. Nichols*, 374 F.3d 959, 965 (10th Cir. 2004)).

## DISCUSSION

The reasonableness inquiry under the Fourth Amendment is fact-specific by nature.  *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).  Accordingly, before proceeding to evaluate whether or not Officer Sandy had reasonable suspicion to conduct the investigatory stop, the Court must first resolve the factual disputes as to the precise circumstances leading up to the stop.  Following these factual findings, the Court will proceed to assess whether or not the Government has met its burden of proving that Officer Sandy's stop was supported by reasonable suspicion.

## I.      Resolution of Disputed Facts

At the evidentiary hearing, the defense highlighted numerous inconsistencies between Officer Sandy's testimony and the report he completed after he arrested Defendant.  In addition, the Government presented the testimony of Luella and Prospero Benavidez, both of whom recounted substantially different circumstances than those the officer described.  While some of these inconsistencies are inconsequential, others led the Court to conclude that portions of

Officer Sandy's testimony were not credible.

Officer Sandy testified that when he pulled up alongside Defendant, Defendant did not turn his head, but rather looked at the officer "out of the corner of his eye." 3/18/11 Evid. Hr'g Tr. at 11. Defendant then made an "abrupt right turn" onto the Benavidezes' property. *Id.* at 11-12. On cross-examination, defense counsel elicited testimony that nowhere in Officer Sandy's report did he mention that Defendant looked at him out of the corner of his eye, nor that his right turn was abrupt. Indeed, the report simply reads: "[A]s I pulled along side of the subject he entered a yard[.]" Gov't Ex. 5 at 2.

With respect to the nature of Defendant's change in direction, the officer's failure to explicitly include the word "abrupt" in his incident report does not suggest that he was exaggerating Defendant's movement in his testimony. An individual's change of direction nearly immediately upon seeing a police officer would be appropriately described as abrupt or sudden in most circumstances, and it would be reasonable for such a movement to pique any given officer's interest. While it is surprising that the officer would remember the nuance of the direction of Defendant's gaze nearly a year after the traffic stop, when he did not include this detail in his incident report, the Court does not find this inconsistency to be significant. However, when viewed in the context of the remainder of Officer Sandy's testimony, it suggests that he may have embellished the facts leading up to the investigatory stop.

More significantly, Officer Sandy's description of the brief period during which Defendant stood on the Benavidezes' porch is notably inconsistent from his incident report, and it differs substantially from the circumstances that the Benavidezes themselves described. At the evidentiary hearing, the officer testified that he observed Defendant approach the door to the Benavidez residence, where he stood and stared into the residence without knocking on the door.

5

Officer Sandy exited his vehicle and asked Defendant to walk towards him, and Defendant

"[c]ontinued to stare straight into the door as if he was oblivious to [the officer's] presence."

3/18/11 Evid. Hr'g Tr. at 14.  Defendant then ignored a second "louder [and] slower," *id*. at 14,

request from the officer to walk towards him.  Officer Sandy described the subsequent events as

follows:

> I walked towards Mr. Aragones, at which point I observed his left hand was in his pocket of his pants . . . .  As I was approaching him, he began to look left and right, over his shoulders . . . .  [A]t that point I asked him to take his hands out of his pocket.  He refused to do that.  With him looking left and right, it's consistent with, in my experience, of an individual that's looking for an exit, which – his best exit route to run, to evade myself, with his hand in his pocket and his actions, I felt a threat.  At one point, I drew my handgun and I ordered him with my handgun, not pointed at him, pointed at the ground, and I told him, "Take your hand out of your pocket."  I continued to approach him as I was ordering him to take his hand out of his pocket.  And he continued to refuse to do so.

*Id*. at 15.

On cross examination, defense counsel pointed out that Officer Sandy did not state in his

incident report that he had twice requested that Defendant approach him, nor did he state that he

had drawn his handgun.  On redirect examination, the officer explained that he does not include

every detail in his incident reports, but rather includes only "major details."  *Id*. at 22.  A review

of the report demonstrated that whereas Officer Sandy did write that he "ordered [Defendant] to

take his hand out of his pocket," Gov't Ex. 5 at 2, nowhere does the report mention the drawing

of a weapon.  The Court was troubled by the suggestion that the officer's drawing of his weapon

was a minor detail, and had the following exchange with the officer:

> Q:  When an officer draws his weapon, you would not regard that as a minor detail, though, would you, Officer?
>
> A:  Your Honor, there's numerous times throughout the day in which we draw our firearm.  And I never pointed it at Mr. Aragones, I simply drew it out and put it in front of me.  There's numerous times that we've given commands to an individual,

with a firearm drawn, and won't be documented in our report.  It's not – it's the escalation of force, and again, it's – unless it's actually pointed at an individual, it's drawn just as a show of force, I put it in my hand.  I never had it pointed at Mr. Aragones.

Q:  Because of that, you don't regard that as a significant event to include in your report?

A:  No, ma'am.

*Id.* at 23.

As Officer Sandy himself testified, an officer's drawing of his handgun is an escalation of force.  *See*, *e.g.*, *Rome v. Romero*, No. 03-MK-1902-BNB, 2006 WL 322589 at *9 (D. Colo. Feb. 10, 2009) (unpublished) (listing officers' drawing of weapons as part of "escalation of force"); *Rosales v. City of Bakersfield*, No. CV-F-05-237 OWW/LJO, 2007 WL 1847628 at *2 (E.D. Cal. June 27, 2007) (unpublished) (same).  Such an escalation of force can turn a *Terry* stop – which is marked by the limited nature of the intrusion it causes – into an arrest for which probable cause is necessary.  *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975)).  Given the significance of this escalation, the Court finds it implausible that an officer would make no note of the fact that he drew his handgun in his incident report, yet nearly a year later he would recollect that he had done so.  This finding is further supported by the officer's sudden recollection of calling out twice to Defendant, whereas he noted only one request in his report.  His testimony that his second request to Defendant was louder and slower than the first suggests that Defendant was defiant in ignoring the officer.  Just as the report's omission of an important detail gives rise to the Court's suspicion that the officer's testimony involved some fabrication, the officer's memory of a minute detail – one which happens to support the officer's framing of the situation as one in which he felt threatened – indicates that the officer embellished the facts.  The Court

therefore found that Officer Sandy was not an entirely credible witness.

The most notable inconsistencies in the evidence presented were those between the testimony of the various witnesses for the Government.  The exchange that Officer Sandy described between Defendant and Prospero Benavidez was entirely different from what the Benavidezes described, and these inconsistencies further undermined the officer's credibility. Whereas the officer stated that Defendant stared into the Benavidez residence without knocking, Prospero Benavidez testified as follows:

Q:  When you first saw the man who was arrested outside of your house, what was he doing?

. . .

A: [He was] standing at the screen door.

. . .

Q:  Did you get a chance to look at him and see whether you knew him?

A:  No.

Q:  I'm sorry.  Did you get a chance to look at him and decide if you recognized him?

A:  Not really.

Q:  No?

A:  It happened so fast.  I went to open the door, he was at the door.  And I didn't even see him, it was, like, on the side of the door.  And that's when the policeman was coming in.  Got to him to put him down to the side, and I just came in.  But he said that we knew him, and he knew us.

Q:  He was saying that you knew who he was?

A:  Yeah.  And he mentioned my grandson's name, Kevin.

Q:  Oh.

A:  That was it.  I – I just came back in.

Q:  And did you know him?

A:  No, I've never seen him that I know of.

Q:  Mr. Benavidez, do you remember if the man knocked on your door or not?

A:  No, I don't.

Q:  And, about how long would you say this man – how long did you see him standing at your door?

A:  Maybe about a few seconds, he was just there, I mean.  And I couldn't say nothing or anything.

Q:  Did you get up from your table?

A:  Yes.

Q:  Did you go towards the door?

A:  Yeah.

Q:  And did you back off from the door?

A:  No.  Like I say, I came to the door and opened it to see what he wanted.  And that's when I saw the policeman coming in.

*Id*. at 29-31.


When Mr. Benavidez was asked to review the statement he signed describing the incident, he disputed the accuracy of the statement.  He acknowledged that he had signed a statement that he refused to open the door, but he testified that this was incorrect.

Q:  But when you wrote the statement, you said you refused to open the door . . . . Is your memory now that you did open the door?

A:  I know I opened the door.  I don't know why I put I refused.

*Id*. at 32.  On cross examination, Mr. Benavidez reiterated: "About that last part, I don't know why I would have written it."  *Id*. at 34.  He hinted at the possibility that someone manipulated his written statement after he signed it.  He stated, "'I refused to open the door,' that could have been added . . . .  It looks kind of fishy to me."  *Id*. at 32-33.

Following Mr. Benavidez's testimony, his wife, Luella Benavidez, testified.  She stated that on April 8, 2010, she and her husband were sitting in their living room when Defendant approached their back door and did not say anything.  She does not remember Defendant knocking.  Mr. Benavidez got up to approach the door, and "by the time he got to the door, the cop already was with [Defendant] at the door."  *Id*. at 36.  Like her husband, Mrs. Benavidez expressed doubts as to the accuracy of the portion of the statement reading that the Benavidezes refused to open the door to Defendant: "[I]t says 'refused.'  We didn't even, you know, talk to him that much or anything.  We didn't talk to him at all or anything.  So, we didn't have to, you know, tell him no or anything."  *Id*. at 40.

The Court found both Benavidezes to be credible witnesses.  As is evident from the summary of their testimony, they testified consistently with each other, particularly with respect to the lack of time they had to ascertain Defendant's identity before Officer Sandy seized him. While certain details escaped their memories, overall they remembered the salient events with clarity.  Contrary to the Government's argument at the hearing, the Benavidezes' confusion as to why their written statement included a portion reading "I refused to open the door" did not undermine their credibility.  Mr. Benavidez's suggestion that someone had tampered with his statement was unsupported by any evidence, and the Court finds such a scenario to be implausible.  Rather, this portion of Mr. Benavidez's testimony was simply speculation, which the Court has not credited.  The Court will not speculate as to why the Benavidezes originally

wrote that they refused to open the door, but their testimony – which was credible and consistent – supports a finding that they could not have refused to open the door, because Officer Sandy was too quick to detain Defendant.

Following the Benavidezes' testimony, the Government's case agent, Matthew Pound, testified that when he interviewed the Benavidezes in December of 2010, they stated that they could not remember whether or not Defendant had knocked on their door. He provided further testimony that is consistent with the Benavidezes' denial of having refused to open the door: "As Mr. Benavidez got up to approach the screen door to ascertain why Mr. Aragones was at their door, he observed Officer Sandy approaching and contacting Mr. Aragones and had no further involvement or contact with Mr. Aragones." *Id*. at 42. Similarly, defense investigator William Elliott testified that in his interview with the Benavidezes, they stated that "[a]s Prospero Benavidez was on his way to the door, [Defendant] was basically grabbed by a policeman." *Id*. at 45. Mr. Elliott further testified that Mrs. Benavidez told him in November of 2010 that Defendant had knocked on the door.

The testimony of all witnesses who testified at the evidentiary hearing, with the exception of Officer Sandy, supports a finding that Defendant stood on the Benavidezes' porch for a matter of seconds. Both Benavidezes testified that Defendant was present on their porch for such a short time that Officer Sandy had physically grabbed Defendant before Mr. Benavidez could walk from his seat (from which he could see the door) to the door. The testimony of both Agent Pound and Mr. Elliot corroborates the Benavidezes' version of the facts. Not only was Officer Sandy's testimony inconsistent with that of four other witnesses, but his report was equally inconsistent. It reads:

> I could . . . see the occupants walk to the door, look out and refuse to open the door.  It was at this point I stopped and asked the male to walk towards me, he only looked at me and then continued to stare into the residence.  I approached him and immediately he turned towards me with his left hand in his pocket.  I could see he was holding onto a large object with his left hand, I ordered him to take his hand out of his pocket and as he did I controlled his left hand by grabbing onto his left wrist.

Gov't Ex. 5 at 2.  Were the Court to credit Officer Sandy's version of the facts, it would be required to find that a much longer period of time elapsed between Defendant turning into the Benavidezes' yard and the officer taking control of Defendant's arm.  However, given the substantial discrepancies between the officer's report and testimony on the one hand, and the generally consistent testimony of four other witnesses on the other, the Court finds that Officer Sandy's version of the events is not credible.

Based on the totality of the testimony presented at the evidentiary hearing, the Court finds that Defendant turned into the Benavidezes' yard upon seeing Officer Sandy's police car, in a manner consistent with avoiding the officer but not to the extent to support a finding of flight.  He then approached the Benavidezes' door, and the record is insufficient to establish whether or not he knocked.  He gazed into the screen door for a matter of seconds, and Officer Sandy seized him before the Benavidezes could respond to Defendant's presence.  Although Mr. Benavidez got up from his seat to see what Defendant wanted, the officer's investigatory stop happened too quickly to allow the residents to respond to the person at their door.

## II.    The Facts as Established at the Evidentiary Hearing Do Not Support a Finding of Reasonable Suspicion

Officer Sandy's investigative detention comported with the Fourth Amendment only if he possessed "a reasonable suspicion, grounded in specific and articulable facts, that [Defendant] . . . was involved in . . . a crime in progress [or] a completed [crime]."  *Poolaw v. Marcantel*, 565 F.3d 721, 736 (10th Cir. 2009) (citations omitted).  The Court may find that Officer Sandy had

reasonable suspicion to seize Defendant only if he had "a particularized and objective basis for suspecting [Defendant] of criminal activity." *United States v. Villagrana-Flores*, 467 F.3d 1269, 1275 (10th Cir. 2006).  An officer may not rely on a "mere hunch" to justify an investigative detention.  *Poolaw*, 565 F.3d at 752.  However, "the level of suspicion required for reasonable suspicion is considerably less than proof by a preponderance of the evidence." *United States v. Lopez*, 518 F.3d 790, 799 (10th Cir. 2008) (citation omitted).

The Government points to eight particularized bases which it argues gave rise to Officer Sandy's reasonable suspicion: (1) the high-crime neighborhood; (2) Defendant's tattoo; (3) Defendant's abrupt change in direction after the police car drove up alongside him; (4) Defendant's unusual demeanor – including staring straight ahead as a patrol car pulled up alongside of him and ignoring Officer Sandy's verbal communications; (5) Defendant's behavior while standing at the Benavidez residence; (6) Defendant's persistence at staring into the residence after the occupants refused to open the door; (7) Defendant looking over his shoulder; and (8) Defendant concealing his hand in his pocket while holding what appeared to be a large object.

### A.      When Defendant Was Seized

Prior to analyzing these asserted factors in the order listed by the Government, the Court must determine when precisely Defendant was seized.  The Government may not rely on facts occurring after the seizure to justify the seizure at its inception.  *United States v. Davis*, 94 F.3d 1465, 1469 n.1 (10th Cir. 1996) ("if the officers' request would have made a reasonable person feel that he or she was not free to leave, then the investigative detention began at exactly that point, and thus Davis' subsequent refusal to comply with the officers' order to stop could not furnish the basis for the [seizure]"); *United States v. Swindle*, 407 F.3d 562, 568 (2d Cir. 2005)

("The settled requirement is, of course, that reasonable suspicion must arise before a search or

seizure is actually effected . . . . [A]n illegal stop cannot be made legal by incriminating behavior

that comes after the suspect is stopped."); *see also United States v. Lambert*, 46 F.3d 1064, 1067

(10th Cir. 1995) (framing question as "whether the officers had reasonable, articulable suspicion

of criminal activity at the time of the seizure").  A seizure occurs when, "in view of all of the

circumstances surrounding the incident, a reasonable person would have believed that he was not

free to leave." *Michigan v. Chestnut*, 486 U.S. 567, 573 (1988).[3]

The brandishing of a weapon is one factor that the Tenth Circuit considers to be

indicative of a seizure.  *United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir. 1999).  Among the

remaining factors are: the threatening presence of several officers;  physical touching by an

officer; use of aggressive language or tone of voice indicating that compliance with the officer's

request is compulsory; prolonged retention of the subject's personal effects; a request to

accompany the officer to the station; interaction in a nonpublic place; and absence of other

---

[3] In *Chestnut*, the Supreme Court took note of its dicta in *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968) that a seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."  486 U.S. at 573.  However, the Court stated that it had since "embraced" a different definition of "seizure":  "[T]he police can be said to have seized an individual only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *Chestnut*, 486 U.S. at 573.

This Court draws attention to the correct definition of "seizure" in light of its discovery of a recent Tenth Circuit case analyzing facts arguably similar to those in the instant case, and applying the *Terry* footnote's definition of "seizure."  *See United States v. Martin*, 613 F.3d 1295 (10th Cir. 2010).  There, the Tenth Circuit cited the *Terry* dicta for the proposition that "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."  *Id*. at 1300. Because this definition was later rejected by the Supreme Court, and the great weight of Tenth Circuit authority indeed applies the correct definition as articulated in *Chestnut*, the Court finds that the *Martin* opinion is an outlier that holds little authoritative value.  *See United States v. VanMeter*, 278 F.3d 1156, 1162 (10th Cir. 2002) ("we follow an earlier, settled precedent over a subsequent derivation").

members of the public.  *Id*. at 1147-48.

The Government concludes in its Response to Defendant's Motion to Suppress that Defendant was not seized until Officer Sandy took physical control of Defendant's arm, because "[p]rior to that moment, Officer Sandy had not made physical contact with Mr. Aragones, brandished a weapon, or ordered him to comply with any request."  Doc. 21 at 5.  As the Court discussed above, it did not find Officer Sandy's testimony that he drew his service weapon and pointed it at the ground to be credible.  Had he done so prior to making physical contact with Defendant, this would alter the Court's analysis of when the seizure of Defendant occurred. Officer Sandy's inconsistent statements fail to establish that he indeed drew his weapon, and the officer's sudden testimony that he twice called out to Defendant – the second time more loudly and slowly – does not support a finding that what he termed a "request," was in fact an order.

Unlike Officer Sandy's testimony regarding the drawing of his gun and his second request that Defendant approach him, the officer's testimony that he "ordered" Defendant to remove his hand from his pocket does indeed affect the Court's seizure analysis.  At the hearing, the officer clarified that when he so "ordered" Defendant, this was a "command . . . as opposed to a request[.]" 3/18/11 Evid. Hr'g Tr. at 15.  He issued this command "as [he] was approaching [Defendant]."  *Id*.  Therefore, at that moment, Defendant was on a porch bordered by a house (as opposed to an open area), the officer was in close proximity to him, and the officer was articulating an order directing Defendant's movement.  A reasonable person in this position would not have felt free to leave.  The Court therefore finds that Defendant was seized within the meaning of the Fourth Amendment at the moment Officer Sandy ordered him to remove his hand from his pocket, as opposed to the moment when the officer took control of his arm.  *See United States v. Simmons*, 560 F.3d 98, 107 (2d Cir. 2009) (defendant in apartment building

15

common area seized after he complied with officers' second request to "hold on a second," and defendant's subsequent refusal to remove hands from pockets was irrelevant to reasonable suspicion analysis).

**B.      Analysis of the Government's Asserted Factors Contributing to Reasonable Suspicion**

The high-crime nature of the neighborhood in which Officer Sandy encountered Defendant is relevant to the reasonable suspicion calculus. *Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000). However, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Id*. Similarly, a tattoo that suggests possible gang affiliation is an appropriate factor for an officer to consider in determining whether or not the totality of the circumstances justify an investigative detention. *United States v. Jeter*, 175 F. App'x. 261, 265 (10th Cir. 2006) (unpublished). Yet generally, other suspicious factors must accompany such a tattoo in order to support a finding of reasonable suspicion. *See United States v. Garcia*, 459 F.3d 1059, 1067 (10th Cir. 2006) ("Although not necessarily determinative by itself, . . . gang connection  . . . supports the reasonableness of a weapons frisk . . ."); *see also United States v. Santio*, 351 F. App'x. 324, 329 (10th Cir. 2009) (unpublished) (reasonable suspicion established when officers investigating stolen vehicle observed defendant, wearing attire associated with gangs, walk towards vehicle in nervous manner and repeatedly look over shoulder to see if anyone was watching him).

Although Defendant's change in direction and his failure to respond to Officer Sandy calling to him might properly cause an officer to conclude that Defendant was avoiding contact with police, these actions contribute only minimally to the officer's reasonable suspicion.

Whereas courts have recognized that "unprovoked flight" and "nervous, evasive behavior" are

pertinent factors in determining reasonable suspicion, *see*, *e.g.*, *Wardlow*, 528 U.S. at 125, a

simple interest in avoiding contact with the police is consistent with innocent behavior.  *See id.*

at 130 ("an innocent person – even one distrustful of the police – might avoid eye contact or

even sneer at the sight of an officer") (quotation omitted); *see also Terry v. Ohio*, 392 U.S. 1, 14

(1968) (recognizing "the wholesale harassment by certain elements of the police community, of

which minority groups . . . frequently complain").

Here, Defendant did not flee or display nervous behavior upon seeing Officer Sandy; he

simply changed direction and approached the Benavidezes' back door after the officer pulled up

alongside him, and he did not respond to the officer's request that he approach him.  An

individual's "refusal to comply is different from full-blown flight and . . . it cannot provide cause

for a reasonable suspicion of wrongdoing."  *Johnson v. Campbell*, 332 F.3d 199, 210 (3d Cir.

2003).  The record is unclear as to whether Officer Sandy called out to Defendant once or twice;

either way, the period of time in which Defendant could have responded to the officer was so

brief that Mr. Benavidez was not even able to reach the door to see who was there.  While

suggestive of an interest in avoiding contact with police, Defendant's conduct is also consistent

with innocence, and it is similar to conduct of other defendants where courts have found no

reasonable suspicion.  *See*, *e.g.*, *United States v. Keith*, 559 F.3d 499, 505 (6th Cir. 2009) (no

reasonable suspicion where pedestrian approached passenger window of vehicle in area known

for drug activity, glanced at police officers fifty yards away, and driver moved car to join

pedestrian on other side of building, outside of officers' view); *United States v. Patterson*, 340

F.3d 368, 372 (6th Cir. 2003) (finding that "walking away from the police when they got out of

their unmarked car constitutes a factor" so innocent as "to be outrightly dismissed" in assessing

whether police had reasonable suspicion); *Morgan v. Woessner*, 997 F.2d 1244, 1254 (9th Cir. 1993) (no reasonable suspicion where drug courier, who was black, told police that his companion "looked like him" and police then observed a black man abruptly turn and walk in other direction upon seeing them).

The Government next cites Defendant's behavior while standing at the Benavidez residence and his persistence in staring into their residence without knocking.  However, the evidence presented at the hearing did not support the Government's framing of these facts in its briefing.  The testimony failed to establish that Defendant stood on the Benavidezes' porch and stared into their residence for any significant period of time.  Regardless of whether or not Defendant knocked on the door, he did not behave himself in a suspicious manner.  He simply approached the door of the residence and the officer seized him before the residents were able to come to the door.  Moreover, Mr. Benavidez's testimony that Defendant stated he knew the Benavidezes' grandson makes it all the more believable that they would approach the door with the intent to open it, but were interrupted from doing so.

Nor is the Court persuaded by the Government's argument that Defendant looking over his shoulders indicates criminal activity.  Officer Sandy testified that Defendant – whose back was to the officer – "look[ed] left and right, over his shoulders" when the officer approached him.  15.  He further stated that in so doing, Defendant "did acknowledge" the officer's presence. *Id*.  This behavior is entirely consistent with the most benign of conduct, including a visit to a friend's house or calling upon a neighbor for assistance.  It does not give rise to a reasonable suspicion of criminal activity, including violation of the public nuisance ordinance, because the time that elapsed was insufficient to suspect that Defendant looked into the Benavidezes' dwelling without their consent.

18

Finally, the Government points to the fact that Defendant concealed his hand in his pocket in the moments prior to the seizure.  As detailed above, Officer Sandy first requested that Defendant remove his hand from his pocket, and when he did not comply, the officer's request escalated to an order.  Defendant's failure to immediately comply with the officer's request certainly gives rise to the possibility that Defendant was concealing something from the officer.  However, just as the Government was unable to show that Defendant stared into the Benavidezes' residence without knocking for an inordinate amount of time, the Government here has failed to establish that Defendant concealed his hand in his pocket for an unreasonable amount of time prior to the inception of the seizure.

It is significant that Officer Sandy testified that he *requested* that Defendant approach him, and further testified that his first communication regarding Defendant's hand in his pocket was also a request.  *See* 3/18/11 Evid. Hr'g Tr. at 14 & 15.  When a police officer is simply requesting that an individual stop and speak to the officer, the individual is not seized because a reasonable person in that person's position would feel free to leave.  *United States v. Harris*, 313 F.3d 1228, 1235 (10th Cir. 2002).  Such a consensual encounter between a police officer and a citizen does not even implicate the Fourth Amendment, *United States v. Fox*, 600 F.3d 1253, 1257 (10th Cir. 2010) (citation omitted), and an individual who is not seized "has a right to ignore the police and go about his business."  *Wardlow*, 528 U.S. at 125.  Given Officer Sandy's clear testimony that he "*requested* that Mr. Aragones walk towards [him]," 3/18/11 Evid. Hr'g Tr. at 14 (emphasis added), and "*asked* him to take his hands out of his pocket," *id*. at 15 (emphasis added), a reasonable person in Defendant's position would have felt free to ignore the officer.  *See Florida v. Royer*, 460 U.S. 491, 498 (1983) (absent seizure, person approached by officer "need not answer any question put to him; indeed, he may decline to listen to the

questions at all and may go on his way").

Here, were the Court to credit Officer Sandy's version of the facts, it would find that Defendant was persistent in ignoring the officer – particularly once his request escalated into an order – in a manner creating reasonable suspicion.  However, as explained above, the conflict between Officer Sandy's testimony and report, and the testimony of the Benavidezes and the investigators who subsequently interviewed them, is irreconcilable.  Because the Court could not credit Officer Sandy's testimony, it examines Defendant's conduct towards the officer in the context of the facts as established at the evidentiary hearing.  In the brief period of time in which Defendant ignored the officer's requests and subsequent command to him, it cannot be said that reasonable suspicion was established, even when this conduct is viewed in light of the high-crime nature of the neighborhood, Defendant's tattoo, and his abrupt turn into the yard.  Given the clear principle that one is free to ignore police officers who are attempting to initiate a consensual encounter, the corollary of this principle is that one's decision to so ignore an officer cannot be significantly suspicious, at least given the period of time that elapsed in this case. *Royer*, 460 U.S. at 498 (in consensual encounter, individual "may decline to listen to the [officer's] questions at all and may go on his way . . . and his refusal to listen or answer does not, without more, furnish [grounds for reasonable suspicion]"); *see also Davis*, 94 F.3d at 1469 n.1 ("if the officers' 'request' was merely precatory, Davis' refusal to stop could not create reasonable suspicion for a *Terry* stop")

In summary, the Government has demonstrated that the following factors reasonably caught Officer Sandy's attention: the high-crime neighborhood, Defendant's tattoo, the fact that Defendant appeared to be avoiding contact with the officer, and the fact that Defendant did not remove his hand from his pocket.  When viewed in the aggregate and analyzed at the time of the

inception of the seizure, these factors do not amount to reasonable suspicion. "Reasonable

suspicion" does not simply mean any minimal level of suspicion; rather, the facts must

reasonably give rise to a belief that the subject has engaged, is engaging, or will imminently

engage in unlawful activity. *United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010).

Although the standard of reasonable suspicion can be satisfied even if the officer is unable to

"rule out the possibility of innocent conduct," the totality of the circumstances still must "form a

particularlized and objective basis" to reasonably believe criminal activity is afoot. *United

States v. Cortez-Galaviz*, 495 F.3d 1203, 1206 (10th Cir. 2007). Here, this standard is not

satisfied.

The Government has advanced a number of cases it argues support a finding of

reasonable suspicion. In *United States v. DeJear*, 552 F.3d 1196 (10th Cir. 2009), the Tenth

Circuit affirmed the district court's denial of a defendant's motion to suppress. The *DeJear*

defendant was sitting in a parked car with the door open in an area known for criminal activity.

*Id*. at 1198. When he saw an officer approach him, his eyes widened and he became visibly

nervous. *Id*. He then began "stuffing both hands [under the front seat] in a very erratic and

nervous state." *Id*. In response to the officer's request and subsequent command to show his

hands, the defendant refused, continuing to push something under the seat. *Id*. The Tenth

Circuit affirmed the district court's denial of the motion to suppress, citing the defendant's

nervousness, his furtive movements, and the high-crime neighborhood as factors establishing

reasonable suspicion.

In addition to *DeJear*, the Government cites *United States v. Black*, 525 F.3d 359 (4th

Cir. 2008), to support its argument that Officer Sandy had reasonable suspicion to conduct the

investigatory stop. In *Black*, a police car approached a group of four or five people gathered in a

21

high-crime area, who "immediately dispersed in different directions" when the officers arrived. *Id*. at 361.  One of the officers called out to the defendant, who has his hand cupped over his pocket "as if grasping an object," and the defendant did not remove his hand upon the officer's request.  *Id*.  The officer observed "a bulge 6 to 8 inches long along the bottom of the pocket and 1 to 1 1/2 inches high that appeared to have a flat side."  *Id*.  The officer then ordered the defendant to remove his hand from his pocket, and he initially complied, but subsequently placed his hand in his pocket again.  *Id*. at 365.  In addition, although the officer could see a bulge in the defendant's pocket, the defendant first claimed his pocket was empty, and then stated it contained only his money and identification.  *Id*. at 362.  After the defendant again placed his hand in his pocket, the officer seized the defendant by placing his hand on his service weapon, ordering him again to remove his hand from his pocket, and cautioning " I don't want to have to shoot you."  *Id*. at 365.  The Fourth Circuit held that these circumstances, taken together, established reasonable suspicion.  *Id*. at 365-66.

Finally, the Government cites *United States v. Edwards*, 424 F.3d 1106 (D.C. Cir. 2005), where the District of Columbia Circuit held that officers had reasonable suspicion to detain the defendant, who was in a parked car in an area known for crime and made furtive movements in response to the identifiable police presence.  *Id*. at 1108.  First, upon seeing the officers arrive, the defendant quickly drove toward the exit of a parking lot, nearly colliding with the police car. *Id*. at 1107.  When the officer exited his vehicle and asked the defendant to stop his car, the officer observed an open bottle of cognac in the car; the defendant attempted to back his car away from the officer; and the defendant "reach[ed] furtively under his seat."  *Id*.  The court cited the high-crime neighborhood and the defendant's furtive movements as basis for the officers' reasonable suspicion.

The instant case is distinguishable from those cited by the Government.  Unlike the defendants in *DeJear* and *Edwards*, Defendant did not act nervously or engage in furtive movements.  He did not, in response to seeing Officer Sandy, place his hands out of the officer's view.  Rather, he failed to immediately comply with the officer's request to move his hand from the position it was already in.  Unlike the defendant in *Black*, Defendant was not part of a group that dispersed in different directions upon seeing police; Officer Sandy could not observe anything consistent with a weapon in Defendant's pocket until after he initiated the seizure; and Defendant did not lie to the officer about the contents of his pocket.  Applying these cases to the facts of the instant case, Defendant's failure to immediately comply with the officer's request – while potentially indicative of his efforts to conceal something from the officer – does not establish reasonable suspicion even when viewed in combination with the other factors discussed.

In contrast to those cases advanced by the Government, the Fourth Circuit examined facts similar to the instant case in *United States v. Burton*, 228 F.3d 524 (4th Cir. 2000), and concluded that the officers there had no reasonable suspicion.  In *Burton*, the defendant was standing at a pay phone and exhibiting no signs of criminal activity when four officers approached him.  *Id*. at 526.  One of the officers identified himself as a police officer and requested the defendant's identification, and the defendant did not respond.  *Id*.  After several repeated requests, the defendant continued to refuse to identify himself.  *Id*.  The officers then asked him to remove his right hand from his coat pocket, and he refused.  *Id*.  They repeated this request, and the defendant still did not respond.  *Id*.  Thereafter the officers forcibly removed the defendant's hand from his pocket and discovered an unlawful weapon.  *Id*.  The court held that although the defendant refused "to talk with the policemen and to remove his hand from his

pocket, [] something more is required to establish reasonable suspicion that criminal activity is afoot." *Id*. at 529.

As explained above, the Court must only consider those facts that occurred prior to the seizure to determine whether or not is was supported by reasonable suspicion. Therefore, unlike in *Burton*, Defendant's second refusal to remove his hand from his pocket does not factor into the reasonable suspicion analysis, because Defendant was already seized at that point. Also unlike *Burton*, Defendant here exhibited some attempt to avoid the police prior to their initiation of contact with him. However, given the minimally suspicious nature of this conduct, it does not significantly alter the level of suspicion the officers in each case had. The Court finds that much like the officers in *Burton*, Officer Sandy articulated insufficient grounds to justify his decision to grab Defendant's arm and forcibly remove it from his pocket. "[S]omething more" than Defendant's refusal to talk to Officer Sandy and to remove his hand from his pocket "is required to establish reasonable suspicion that criminal activity is afoot." *See id*. at 529.

### C.    Mistake of Fact

Finally, the Government argues that if Defendant did not knock on the Benavidezes' door, Officer Sandy's belief that he did not knock amounts to a reasonable mistake of fact. An officer's mistake of fact does not negate reasonable suspicion. *Illinois v. Rodriguez*, 497 U.S. 177, 197 (1990). "That an officer's suspicions may prove unfounded does not vitiate the lawfulness of a stop, provided the officer's error was made in good faith and is objectively reasonable under the circumstances." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009).

As the Court concluded above, the record is insufficient to support a finding one way or another as to whether or not Defendant knocked. If Defendant indeed knocked, and Officer

Sandy believed he did not, such a belief would have been reasonable.  However, given the short period of time that elapsed between Defendant approaching the Benavidezes' door and Officer Sandy's investigative stop, it was nonetheless unreasonable for the officer to seize him under the facts he cited.  Moreover, as described above, the officer's contention that he did not even begin to walk up to the Benavidezes' porch until after he saw them refuse to open the door renders his description of the events incredible.  The facts established at the evidentiary hearing fail to support a finding of reasonable suspicion to believe any illegal activity – including public nuisance under the Albuquerque ordinance – was afoot.

## CONCLUSION

The Government has not met its burden of demonstrating that Officer Sandy's investigatory stop was based upon reasonable suspicion.  Accordingly, the firearm the officer discovered in Defendant's pocket must be suppressed.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence Obtained as a Result of Violations of Amendment IV to the United States Constitution [Doc. 18] is **GRANTED**.

Dated this 2nd day of May, 2011.

_____
**MARTHA VAZQUEZ**
**UNITED STATES DISTRICT JUDGE**

*Attorney for Plaintiff:*
Paige Messec

*Attorney for Defendant:*
Todd Farkas